**GTE MOBILNET OF SOUTH TEXAS LIMITED PARTNERSHIP,**
Appellant,

v.

**Adrien PASCOUET and Chantal Pascouet, Appellees.**

No. 14–99–00869–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 13, 2001.

Rehearing Overruled Oct. 31 and Nov. 1, 2001.

Steve M. Zager, Austin, for appellant.

Thomas W. Sankey, E. John Gorman, Houston, for appellees.

Panel consists of Justices YATES, EDELMAN, and WITTIG.

## OPINION

WITTIG, Justice.

The Pascouets brought nuisance and invasion-of-privacy claims after GTE Mobilnet of South Texas Limited Partnership erected a 126–foot cellular phone tower 20 feet from their Bunker Hill back yard. We examine whether the Federal Telecommunications Act of 1996 preempts the Pascouets' claims; we also review the jury's findings against GTE and its assessment of nearly one million dollars in damages. The trial court denied the Pascouets' requests for a permanent injunction and for declaratory relief, and it rendered judgment on the jury's verdict. On appeal, GTE attacks the money judgment; on cross-appeal, the Pascouets assert that the trial court should have granted injunctive and declaratory relief. We overrule all issues presented in this appeal, except that we hold there was no evidence to support the jury's findings: (1) of future damages for the nuisance claims; and (2) of liability and damages as to the invasion-of-privacy claims. For the reasons stated below, we reverse and render judgment that the Pascouets take nothing as to future damages for their nuisance claims and as to all of their invasion-of-privacy claims; we affirm the remainder of the trial court's judgment, including past damages for nuisance.

## Background

The Pascouets moved to Houston from France in 1979. In 1983 they purchased a home in the City of Bunker Hill Village ("Bunker Hill") for $400,000. They were attracted by the peaceful environment in Bunker Hill as well as by the strict zoning ordinances there. The Pascouets knew about the Bunker Hill municipal complex that was next to their property ("Municipal Complex"), but the city's activities there never bothered them before the occurrence made the basis of this suit.

To fill a gap in its cellular phone coverage, GTE needed to find a new transmission tower in the Bunker Hill area. The Memorial Village Police Department ("Police Department") provides police services for several cities, including Bunker Hill. The Police Department already operated an 80-foot communications tower on the Municipal Complex. This tower was several hundred feet from the Pascouets' house. The Police Department was not receiving adequate coverage from the antenna on the 80-foot tower, and Bunker Hill wanted to remedy this problem to improve its police service. GTE and Bunker Hill executed a License Agreement allowing GTE to build a 126-foot tall communications tower ("Tower") and equipment building ("Building") on the Municipal Complex. Under the License Agreement, GTE pays Bunker Hill $10,000 per year during the term of the agreement, which has an initial term of ten years, with an option to extend the term for four more ten-year periods. GTE agreed to put the Police Department antenna at the top of the Tower to improve the Police Department's coverage.

Bunker Hill instructed GTE not to build the Tower near the Bunker Hill city hall but rather to build it near the edge of the Municipal Complex, close to the boundary of the Pascouets' property. GTE did not lease the Municipal Complex; rather, GTE obtained a license from Bunker Hill to construct and operate the Tower and the Building on the Municipal Complex. Bunker Hill and GTE contend that Bunker Hill and its property are not subject to Bunker Hill's zoning ordinances. Therefore, GTE did not obtain any building permits from Bunker Hill, nor did it apply for a special exception or a special use permit or any other amendment to Bunker Hill's zoning ordinances to allow for the erection and operation of the Tower and the Building.

Bunker Hill's city administrator, Mr. Eby, talked to Mrs. Pascouet one time, describing the new construction as being "close to the fence" and as a "little building" with an "antenna" nearby. He promised to update the Pascouets later, but he never spoke to the Pascouets again. GTE erected the Tower on August 25, 1994, without having had any communications with the Pascouets. The Pascouets filed this suit against GTE and Bunker Hill four months later. The Tower stands about twenty feet from the property line and sixty feet from the Pascouets' home.

The Building had two floodlights that were on all night and that illuminated the Pascouets' backyard so that one could read and write on their patio in the middle of the night. The Building also had two noisy air conditioners, with one operating all the time. The noise from the air conditioners drowned out normal conversation in the backyard, could be heard indoors, and interrupted the Pascouets when they were trying to sleep. When the door to the Building was open, the GTE workers could and did look out over the Pascouets' fence and see into their backyard. Workers would also climb the Tower. In 1997, GTE turned the floodlights off. In April of 1998, GTE built a fence so that its

workers at ground level could not see into the Pascouets' backyard.

After the Pascouets asserted federal claims against Bunker Hill, the defendants removed this case to federal court. Shortly before trial in federal court, the Pascouets settled with Bunker Hill for $28,000 and dismissed Bunker Hill from this suit. The federal court then remanded this case to state court. After a three-day trial, the trial court charged the jury with questions on liability and damages for nuisance and invasion of privacy, percentage-of-responsibility questions as to Bunker Hill and GTE, and reasonable attorney's fees for the Pascouets' declaratory judgment action. Although the jury determined reasonable attorney's fees for the Pascouets' declaratory judgment action, the court instructed the jury two times that it was not to decide the legal issue of whether the Tower and the Building violate any Bunker Hill ordinance and that the court—not the jury—would decide this issue.

The jury found that the Tower was a nuisance for which GTE was 100% responsible and awarded actual damages of $748,000—$28,000 for loss of market value in the house, $60,000 for Mr. Pascouet's past loss of use and enjoyment, $180,000 for his future loss of use and enjoyment, $120,000 for Mrs. Pascouet's past loss of use and enjoyment, and $360,000 for her future loss of use and enjoyment.

The jury also found that both GTE and Bunker Hill invaded the Pascouets' privacy and that Bunker Hill was 30% responsible and GTE 70% responsible for the invasion-of-privacy damages. The jury assessed actual damages of $225,000—$100,000 for Mr. Pascouet's past mental anguish, $50,000 for his future mental anguish, $50,000 for Mrs. Pascouet's past mental anguish, and $25,000 for her future mental anguish. The jury also found reasonable attorney's fees for trial and appellate work

as to the Pascouets' declaratory judgment action.

The Pascouets requested that the trial court enter a declaratory judgment that Bunker Hill's zoning ordinances apply to GTE and that GTE, the Tower, the Building, and the lot on which the Tower and Building were constructed violate various Bunker Hill zoning ordinances. The Pascouets also requested a permanent injunction requiring GTE to: (1) remove the Tower and Building because they violate the Bunker Hill ordinances; (2) comply with the zoning ordinance in the future; and (3) cease its operations that are a nuisance. The trial court denied the Pascouets' requests for injunctive and declaratory relief. The trial court entered judgment on the jury's verdict, except that it awarded no attorney's fees.

GTE filed a motion to modify the judgment to reduce it by $486,500 and by 50% of the prejudgment interest based on an alleged settlement credit of 50% under Chapter 32 of the Texas Civil Practice and Remedies Code. GTE also filed a motion for judgment not withstanding the verdict and for new trial. The trial court denied these motions. GTE appealed, and the Pascouets cross-appealed.

## Issues Presented

GTE presents the following issues: (1) whether the Federal Telecommunications Act of 1996 ("FTA") preempts the Pascouets' common-law claims for nuisance and invasion of privacy; (2) whether the trial court abused its discretion by admitting evidence regarding Bunker Hill's zoning ordinances; (3) whether the trial court abused its discretion by admitting the expert testimony of Michael Coker; (4) whether the evidence was legally and factually sufficient to support the jury's nuisance findings; (5) whether the evidence was legally and factually sufficient to sup-

port the jury's invasion-of-privacy findings; (6) whether GTE was entitled to a pro-rata settlement credit due to the Pascouets' settlement with Bunker Hill. By their cross-appeal, the Pascouets present the following issues: (1) whether the trial court abused its discretion by denying the Pascouets' request for a permanent injunction; and (2) whether the trial court erred by denying the Pascouets' request that it find and declare certain alleged violations of the Bunker Hill zoning ordinances.

### Does the FTA Preempt the Pascouets' Common–Law Claims?

In its first issue, GTE argues that we should reverse and render judgment that the Pascouets take nothing because the Pascouets' claims are impliedly preempted by the FTA. The parties have not cited and we have not found any federal or state cases dealing with the specific preemption issue raised by GTE. We hold that the FTA does not preempt the Pascouets' claims in this case.

 Under the Supremacy Clause of the United States Constitution, the laws of the United States are the supreme law of the land, and a state law that conflicts with federal law is preempted and "without effect." U.S. CONST. art. VI, cl. 2; *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128–29, 68 L.Ed.2d 576 (1981). A federal law may expressly preempt state law. *See Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992). Preemption may also be implied if the scope of the statute indicates that Congress intended federal law to occupy the field exclusively or if state law actually conflicts with federal law. *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287, 115 S.Ct. 1483, 1487, 131 L.Ed.2d 385 (1995). A state law presents an actual

conflict with federal law when "it is 'impossible for a private party to comply with both state and federal requirements' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Myrick*, 514 U.S. at 287, 115 S.Ct. at 1487 (quoting, respectively, *English v. General Elec. Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 2274–75, 110 L.Ed.2d 65 (1990) and *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). We must decide whether it is impossible for GTE to comply with both state law and the FTA and whether the Pascouets' claims stand as an obstacle to the accomplishment and execution of the full purposes of the FTA.[1] *See Myrick*, 514 U.S. at 287, 115 S.Ct. 1483, 131 L.Ed.2d 385

 Historically, the states have exercised primary authority in matters concerning land use and zoning. *Federation of Advertising Indus. Representatives, Inc. v. City of Chicago*, 189 F.3d 633, 639 (7th Cir.1999). Thus, by enacting the FTA, Congress legislated in an area traditionally regulated by the states. *Id.* Therefore, our preemption analysis must begin with the presumption that these historic powers of the states are not to be superseded by the FTA unless that was the clear and manifest purpose of Congress. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 121 S.Ct. 2404, 2414–15, 150 L.Ed.2d 532 (2001). This presumption "is crucial in our federal system, '[f]or if in close or uncertain cases a court proceeds to preempt state laws where that result was not clearly the product of Congress's considered judgment, the court has eroded the dual system of government that ensures our liberties, representation, diversity, and effective governance.' " *Hyundai*

---

**1.** GTE does not assert that the FTA expressly preempts the Pascouets' claims or that Congress intended the FTA to exclusively occupy the field.

*Motor Co. v. Alvarado,* 974 S.W.2d 1, 5 (Tex.1998), *quoting* Kenneth Starr et al., *The Law of Preemption: A Report of the Appellate Judges Conference, American Bar Association* 40 (1991). Therefore, we must consider the FTA's language, the context of its enactment, and our understanding of the way Congress intended the statute and its regulatory scheme to affect business, consumers, and the law, in order to discern whether Congress manifested a clear intent that the FTA preempt the Pascouets' common-law claims. *Hyundai Motor Co.,* 974 S.W.2d at 5.

 Our analysis starts with the relevant language of the FTA.[2] *See Lorillard Tobacco Co.,* 533 U.S. at ——, 121 S.Ct. at 2415. GTE asserts that the Pascouets' common-law claims for nuisance and invasion of privacy are impliedly preempted because they conflict with the following parts of the FTA:

**§ 253 Removal of barriers to entry**

**(a) In general**

**No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.**

**(b) State regulatory authority**

**Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service,** **protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.**

. . .

**§ 332. Mobile services**

. . .

(c) Regulatory treatment of mobile services

(7) Preservation of local zoning authority

**(A) General authority**

**Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.**

(B) Limitations

(i) The regulation of the placement, construction,. and modification of personal wireless service facilities by any State or local government or instrumentality thereof—

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable

---

**2.** In construing a statute, our objective is to determine and give effect to the legislature's intent. *See National Liability and Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527 (Tex.2000). We presume that the legislature intended the plain meaning of its words. *Id.* If possible, we must ascertain the legislature's intent from the language it used in the statute and not look to extraneous matters for an intent the statute does not state. *Id.* When interpreting a statute, we consider the entire act, its nature and object, and the consequences that would follow from each construction. *Atascosa County v. Atascosa County Appraisal Dist.,* 990 S.W.2d 255, 258 (Tex.1999). We must reject any statutory interpretation that defeats the legislative purpose. *Id.*

period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

(v) Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief.

. . .

47 U.S.C. §§ 253 & 332(c)(7) (emphasis added).

Further, the Federal Telecommunications Act provides as follows:

Applicability of Consent Decrees and Other Law

. . .

(c) Federal, State, and local law.—

(1) No implied effect.—This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments.

Pub.L. No. 104–104, Title VI, § 601, Feb. 8, 1996, 110 Stat. 56, 143 (1996).

In *Cipollone,* the Supreme Court noted that

[w]hen Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a "reliable indicium of congressional intent with respect to state authority," . . . "there is no need to infer congressional intent to pre-empt state laws from the substantive provisions" of the legislation. Such reasoning is a variant of the familiar principle of *expressio unius est exclusio alterius:* Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted.

505 U.S. at 517, 112 S.Ct. at 2618 (citations omitted). This language led a number of courts to conclude that, under *Cipollone,* an express preemption clause forecloses implied preemption. *See Hyundai Motor Co.,* 974 S.W.2d at 9. But in *Myrick,* the court explained that *Cipollone* announced no such absolute rule. *Myrick,* 514 U.S. at 288–89, 115 S.Ct. at 1488. Rather, "[a]t best, *Cipollone* supports an inference that an express pre-emption clause forecloses implied pre-emption." *Id.* at 289, 115 S.Ct. at 1488. In § 332(c)(7), there is not only language that expressly preempts state law, but, unlike *Cipollone,* there is also language that limits the preemptive effect of the statute to the express language of § 332(c)(7)(B). This statutory language is strong evidence that Congress did not intend to preempt state regulation

unless it conflicted with the express provisions of § 332(c)(7)(B).

■■■ A state law may be preempted when it is impossible to comply with both federal and state requirements. *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). There is no such impossibility here. It is not impossible for GTE to comply both with the FTA and with the state common-law of nuisance and invasion of privacy. The FTA does not require GTE to engage in the conduct for which it was found liable by the jury in this case. Nor is it impossible for GTE to comply with federal law and at the same time to respond in damages for breach of common-law duties. *See Perry v. Mercedes Benz of N. Am., Inc.,* 957 F.2d 1257, 1264 (5th Cir.1992); *cf. Cipollone,* 505 U.S. at 518, 112 S.Ct. at 2608 ("[T]here is no general, inherent conflict between federal pre-emption of state warning requirements and the continued vitality of state common-law damages actions."). Common-law damage claims are not the same as a state statute or regulation that prohibits GTE from taking actions that the FTA expressly permits. *Cf. Florida Lime & Avocado Growers,* 373 U.S. at 141–42, 83 S.Ct. at 1217.

■■■ A federal law may also preempt state law when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Myrick,* 514 U.S. at 287, 115 S.Ct. at 1487. The anti-preemption clauses in the FTA show that Congress's purpose was to preempt state law only as to a narrow area of telecommunications policy and to leave the remaining areas to state regulation. *See* 47 U.S.C. §§ 253(b) & 332(c)(7)(A); *Goforth v. Smith,* 338 Ark. 65, 991 S.W.2d 579, 585 (1999) ("Congress has carved out a narrow and well defined area of telecommunications policy in which

it has exercised its constitutional authority to preempt state and local laws, and has left substantial elements of zoning and land-use matters to state and local control."). Further, the legislative history supports the notion that the FTA was meant to have a narrow, explicit preemptive effect. The conference committee report states that "[t]he conference agreement creates a new section 704 [47 U.S.C. § 332(c)(7)] which prevents Commission preemption of local and State land use decisions and preserves the authority of State and local governments over zoning and land use matters except in the limited circumstances set forth in the conference agreement." H.R. Conf. Rep. No. 104–458, at 207–8, *reprinted in* 1996 U.S.C.C.A.N. 124, 222.

■■■ There is a presumption against preemption in this case. The FTA states that it does not preempt state zoning and land use regulation unless they conflict with its express terms. The Pascouets' claims do not conflict with the express terms of the FTA. *See* 47 U.S.C. §§ 253(a) & 332(c)(7)(B). The FTA does not provide any remedies to replace state common-law torts relating to land use. Therefore, we find that the Pascouets' common-law claims for nuisance and invasion of privacy do not create an actual conflict with the FTA that would trigger implied preemption. *See Hyundai Motor Co.,* 974 S.W.2d at 5–13. Courts should not conclude that Congress has preempted state law unless there is an unambiguous congressional mandate to that effect. *Florida Lime & Avocado Growers,* 373 U.S. at 146–47, 83 S.Ct. at 1219. The FTA's language, context, and legislative history reveal no unambiguous mandate that the Pascouets' common-law claims be preempted. GTE cites cases that do find preemption as to the FTA and the Federal Communications Act; however, these cases are inapplicable

on our facts because the claims in those cases related to complaints about radio wave emissions or other matters that are expressly preempted. *See, e.g., Goforth,* 991 S.W.2d at 581–88 (holding that FTA preempted state damage claims to the extent that they complained about the environmental effects of radio wave emissions but not otherwise). The Pascouets have not asserted any claims about radio wave emissions or any other matter that is expressly preempted by the FTA. Accordingly, we hold that the FTA does not preempt the Pascouets' claims.[3] We overrule GTE's first issue.

### Did GTE Preserve Error as to the Admission of Evidence Regarding Bunker Hill's Zoning Ordinances?

In its second issue, GTE claims that it objected repeatedly to the introduction of evidence relating to the Bunker Hill zoning ordinances, that this evidence was inadmissible under Texas Rules of Evidence 401 and 403, and that the trial court abused its discretion by admitting this evidence over GTE's objection. GTE's statements regarding preservation of error are incorrect. The record does not show that GTE timely asserted these objections. In fact, GTE did not object to the admission of the Bunker Hill zoning ordinances into evidence. In support of GTE's contention that it preserved error, GTE refers to two trial briefs that it filed. These briefs do not assert these evidentiary objections, and they do not ask the court to rule on the Pascouets' declaratory judgment action before trial. Both of these briefs, however, do contain the assertion by GTE that "violation of the City's zoning ordinance is an integral element of [the Pascouets'] nuisance claim."

3. In the alternative, the FTA would not preempt the Pascouets' claims because it is not retroactive and because it was enacted in 1996; the Pascouets' claims accrued in 1994.

This assertion is contrary to the position asserted by GTE in its second issue. GTE has not preserved its second issue for our review by a timely objection in the trial court that specifically stated GTE's objection to the admission of the zoning evidence. Tex.R.App. P. 33.1. Furthermore, GTE waived this complaint by inviting the alleged error of which it now complains. *International Piping Sys., Ltd. v. M.M. White & Assocs., Inc.,* 831 S.W.2d 444, 449 (Tex.App.—Houston [14th Dist.] 1992, writ denied). We overrule GTE's second issue.

### Did the Trial Court Abuse its Discretion by Admitting the Expert Testimony of Michael Coker?

In its third issue, GTE asserts that the trial court abused its discretion by overruling GTE's objection to the testimony of Michael Coker—a land use and planning expert. Coker testified to the amount of light and noise that he observed on the Pascouets' property at night. He also testified that in his opinion the operation of the Tower was a nuisance and an invasion of privacy. On appeal, GTE asserts that Coker was unqualified and unreliable and that his testimony was inadmissible under Tex.R. Evid. 702 and *E.I. du Pont de Nemours and Co. v. Robinson,* 923 S.W.2d 549 (Tex.1995).

GTE objected at trial that Coker was not qualified as an expert in the areas in which he offered opinion testimony and that he had no specialized training to give an opinion as to the brightness of the Building lights on the night that Coker visited the property. Coker testified to his qualifications and experience in the area of land use and planning. After reviewing

*See AviComm, Inc. v. Colorado PUC,* 955 P.2d 1023, 1028–29 (Colo.1998) (FTA does not apply retroactively to proceeding commenced before Congress enacted FTA).

the record, we hold that the trial court did not abuse its discretion in determining that Coker was qualified as an expert by knowledge, skill, experience, training, or education. We also find no abuse of discretion in allowing Coker to testify as to the brightness of the Building lights on the Building when Coker visited the Pascouets' backyard at night. *Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 499–501 (Tex.2001).

 Regarding GTE's assertion that Coker's testimony was inadmissible under Tex.R. Evid. 702 and the *Robinson* case, GTE did not preserve error in the trial court. To preserve error as to the reliability of an expert, GTE had to obtain a ruling on its objection before trial or when the evidence was offered. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 409 (Tex.1998). For preservation of error purposes, GTE relies on its motion for new trial, but this motion was filed after trial, too late to preserve error. *Id.* GTE also cites its motion to strike and motion in limine filed in federal court as well as its trial brief. We see no mention of any *Robinson* argument in the trial brief, and the record does not show that the trial court ruled on any motion or objection in these documents relating to *Robinson.* Therefore, these documents preserved no error. *See* Tex.R.App. P. 33.1(a)(2); *Wilson v. Korthauer,* 21 S.W.3d 573, 578 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

At trial, the court overruled GTE's objections that Coker was not qualified as an expert in the areas in which he offered opinion testimony and that he had no specialized training to give an opinion regarding the brightness of the Building lights. After allowing the Pascouets some time to qualify Coker as an expert witness, GTE objected and took the witness on voir dire, but GTE specified no grounds for its objection. GTE then stated that Coker was not qualified as an expert in the areas in which he offered opinion testimony, and Coker testified further about his qualifications, outside of the presence of the jury. When the trial court asked if GTE had any further argument, GTE responded that it believed that the Pascouets had not "met the standard required under *Robinson* or *Daubert* or Rule 702." GTE, however, did not specify the standard that it claimed had not been satisfied. For example, was GTE referring to the requirement that experts be qualified or that their testimony be relevant or that their testimony be reliable? Further, GTE made this general statement as an argument; rather than as an objection. GTE did not object on these grounds when Coker later testified as to his expert opinions. On this record, we hold that GTE did not preserve error as to its objections under *Robinson* and Rule 702. *See The Kroger Co. v. Betancourt,* 996 S.W.2d 353, 360–61 (Tex.App.—Houston [14th Dist.] 1999, pet. denied) (objection that expert's testimony was speculative and unreliable preserved no error as to complaint that expert was not qualified to testify as expert); *Rendleman v. Clarke,* 909 S.W.2d 56, 58 (Tex.App.— Houston [14th Dist.] 1995, writ dism'd) (to preserve error as to erroneous admission of evidence, a party must present to the trial court—(1) a *timely* request, objection, or motion; (2) state the specific grounds of the complaint; and (3) obtain a ruling before the testimony is offered and received).

In any event, we conclude that the trial court did not abuse its discretion in admitting Coker's testimony. Texas Rule of Evidence 702 allows a witness qualified as an expert by knowledge, skill, experience, training, or education to testify on scientific, technical, or other specialized subjects if that testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue. GTE argues that

Coker did not satisfy any of the *Robinson* factors, that there is a vast analytical gap between the facts and his opinions, and that Coker did not base his opinions on any data or other scientifically accepted analysis. GTE also argues that Coker's experience is in land-use planing and that this experience does not allow him to give opinions regarding the Tower and the Building.

 In *Robinson,* the court listed factors that a court may consider in determining whether the testimony of a scientific expert is admissible under Rule 702.[4] *Robinson,* 923 S.W.2d at 557. In *Gammill,* however, the court indicated that the six *Robinson* factors are not as appropriate for non-scientific experts, and the court recognized that, in non-scientific cases, it is impossible to set out specific criteria for evaluating the reliability of expert testimony. *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 725–26 (Tex.1998). Indeed, the court observed that experience alone could provide a sufficient basis for an expert's testimony in some cases. *See id.* After reviewing Coker's testimony concerning his experience in land use and planning and his familiarity with what typically constitutes a substantial and unreasonable interference with the use and enjoyment of real property, we find that the trial court did not abuse its discretion in determining that Coker's testimony was reliable. *See Helena Chem. Co.,* 47 S.W.3d at 499–501; *Gammill,* 972 S.W.2d at 725–26. We overrule GTE's third issue.

## Was the Evidence Legally and Factually Sufficient to Support the Jury's Nuisance Findings?

In its fourth issue, GTE attacks the jury's findings as to the Pascouets' nuisance claim, arguing that GTE cannot be liable for nuisance as a matter of law because there is no personal injury or physical damage and that there was legally and factually insufficient evidence to support the jury's loss-of-use-and-enjoyment findings.[5]

 GTE first asserts that there was no evidence at trial to support nuisance liability because the Pascouets did not prove nuisance per se and because the Pascouets must prove physical injury to their person or property in order to recover on a nuisance in fact claim. GTE's view of nuisance liability is to too narrow. A nuisance is a condition which substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it. *Meat Producers, Inc. v. McFarland,* 476 S.W.2d 406, 410 (Tex.Civ.App.—Dallas 1972, writ ref'd n.r.e.), *citing Sherman Gas & Elec. Co. v. Belden,* 103 Tex. 59, 123 S.W. 119 (1909). A "nuisance per se" is a nuisance at all times and locations. *City of Sundown v. Shewmake,* 691 S.W.2d 57, 59 (Tex.App.—Amarillo 1985, no writ). A "nuisance in fact" is a condition that is a nuisance because of its particular surroundings. *Id.*

GTE cites *Maranatha Temple, Inc. v. Enterprise Prods. Co.,* 893 S.W.2d 92, 98–

---

**4.** These factors are (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or technique. *Robinson,* 923 S.W.2d at 557.

**5.** GTE does not challenge the jury's finding of $28,000 in loss of market value.

99 (Tex.App.—Houston [1st Dist.] 1994, writ denied) and argues that the Pascouets cannot recover for the loss of use and enjoyment caused by GTE's nuisance unless the Pascouets prove either a nuisance per se or physical damage to persons or property. While dicta in the *Maranatha Temple* case might be read to support GTE's argument, GTE's assertion that non-physical nuisance damages may only be recovered under a nuisance per se theory is incorrect. The court in *Meat Producers* rejected any physical damage requirement, stating: "We do not agree that damages to land from nuisance are limited to physical disturbance of the soil or water. A nuisance is by definition a non-trespassory invasion of another's interest in the use and enjoyment of land ... An offensive odor in itself may be sufficient interference with the use and enjoyment of land to entail liability for permanent damage." *Meat Producers, Inc.*, 476 S.W.2d at 410–11. Other cases hold that noise and glaring light—two of the Pascouets' complaints in this case—can be a nuisance. *See, e.g.*, *Lamesa Co-op. Gin v. Peltier*, 342 S.W.2d 613, 616 (Tex.Civ.App.—Eastland 1961, writ ref'd n.r.e.) ("The facts found by the jury show that defendant's proposed use of its property would cause loud noises, glaring lights, dust, odors, smoke and cotton lint to come into plaintiff's home and substantially, materially and 'unreasonably' interfere with plaintiff and his family in the proper use and enjoyment of their home ..."); *City of River Oaks v. Moore*, 272 S.W.2d 389, 390 (Tex.Civ.App.—Fort Worth 1954, writ ref'd n.r.e.) (plaintiffs alleged, among other things, that water towers had lights that shined into their bedroom, disturbing their sleep and that gauges and other devices attached to the

sides of the towers created loud noises). These cases all involved nuisance in fact rather than nuisance per se. Therefore, GTE's argument that the Pascouets had to prove physical damage or nuisance per se fails.[6]

■■■■■ GTE also contends there was no evidence or factually insufficient evidence to support the jury's damage findings as to loss of use and enjoyment of the Pascouets' property. When "no evidence" and "factual sufficiency" issues are raised on appeal, we address the "no evidence" issue first. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex.1981). In reviewing "no evidence" issues, we consider only the evidence and reasonable inferences therefrom that support the finding in question and disregard all evidence and inferences to the contrary. *Texarkana Memorial Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 838 (Tex.1997). If there was any evidence of probative force to support the finding, then the issue must be overruled and the finding upheld. *Sherman v. First Nat'l Bank*, 760 S.W.2d 240, 242 (Tex.1988).

■■■■■ When reviewing a challenge to the factual sufficiency of the evidence, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986) (per curiam). After considering and weighing all the evidence, we set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986). The jury as trier of fact is the sole judge of the credibility of the witnesses and the weight

---

**6.** This argument also fails because GTE failed to preserve error in this regard by either objecting or tendering appropriate instructions and definitions on GTE's theory for the jury questions involving nuisance liability and damages, e.g. a definition of loss of use and enjoyment of property that contains a physical damage requirement.

to be given to their testimony. *Mayes,* 11 S.W.3d at 451. Because we are not the fact finder, we may not substitute our own judgment for that of the trier of fact, even if we would reach a different answer on the evidence. *Ellis,* 971 S.W.2d at 407. The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *Mayes,* 11 S.W.3d at 451.

■ First, GTE alleges there was no evidence to support the jury's award to the Pascouets' for past loss of use and enjoyment of their property. Reviewing the record in the light most favorable to the award, we note that before the erection of the Tower the Pascouets made frequent use of their backyard. The Pascouets testified to a substantial and more or less continuous interference with the use and enjoyment of their property caused by bright lights at night, noisy air conditioners near the Building and close to their property line, and GTE workers servicing the Building near their backyard. GTE workers peeped into the Pascouets' backyard while on service visits. Viewing this evidence in the light most favorable to verdict, and disregarding all evidence to the contrary, we find there was more than a scintilla of evidence supporting the jury's award to the Pascouets for past loss of use and enjoyment of their property. *See Minnesota Min. and Mfg. Co. v. Nishika Ltd.,* 953 S.W.2d 733, 738–39 (Tex.1997).

■ Thus, we turn to GTE's contention that the evidence is factually insufficient to support the jury's award to the Pascouets' for past loss of use and enjoyment of their property. In nuisance law, loss-of-use-and-enjoyment damages compensate claimants for their personal discomfort, annoyance, and inconvenience. *Daniel v. Fort Worth & R.G. Ry. Co.,* 96 Tex. 327, 72 S.W. 578, 579–80 (1903). The Pascouets testified that the Tower and

Building significantly disturbed their once-tranquil lifestyle that included gardening, socializing, dining, and lounging in their backyard. After GTE constructed the Tower and the Building, the Pascouets spent much less time in their backyard than they did before. Mr. Pascouet no longer enjoyed being in his backyard as much as he used to. The bright lights were on every night after sunset until the early morning, lighting up the Pascouets' backyard. Two air conditioners by the Building and proximate to the Pascouets' property alternated running all the time, producing a loud noise that drowned out normal conversation in the backyard. These air conditioners often disturbed the Pascouets' sleep. Mrs. Pascouet testified that she spent a lot of time in the house and that the nuisance caused by the Tower and the Building caused her distress, made her cry, and made her not interested in living in her house any more. The Pascouets testified that they went from about ten years of an idyllic home life to wanting to flee the home they loved.

■ GTE did not controvert much of the Pascouets' evidence as to loss-of-use-and-enjoyment damages; however, GTE cross-examined the Pascouets' witnesses and experts. That this or any other court may have awarded a lesser or larger sum as fact finders is not material; absent some evidence, implicit or explicit, of jury bias or prejudice, we must give every intendment to the evidence supporting the verdict. *Allen v. Whisenhunt,* 603 S.W.2d 242, 244–45 (Tex.Civ.App.—Houston [14th Dist.] 1980, writ dism'd w.o.j.). Based on the record before us, neither the amount of the award, nor any other evidence establishes the existence of jury bias or prejudice, nor is the jury's award of past loss-of-use-and-enjoyment damages to the Pascouets so against the overwhelming weight

and preponderance of the evidence as to be manifestly wrong and unjust. *Id.*

GTE also challenges the sufficiency of the evidence supporting the findings as to future nuisance damages. The jury was asked to find the amount of loss-of-use-and-enjoyment damages that the Pascouets in reasonable probability will sustain in the future. Under the "reasonable probability rule" for future damages, Texas courts have consistently held that the award of future damages rests with the sound discretion of the jury. *See Rosenboom Mach. & Tool v. Machala,* 995 S.W.2d 817, 828 (Tex.App.—Houston [1st Dist.] 1999, pet. denied). Also relevant to determining an award of future damages is the nature of the injury and the plaintiff's condition at the time of trial. *Whole Foods Market Southwest, L.P. v. Tijerina,* 979 S.W.2d 768, 781–82 (Tex.App.—Houston [14 th Dist.] 1998, pet. denied).

As to future damages, Mrs. Pascouet did not testify at all about whether she would have future damages. Further, Mr. Pascouet testified that the offending lights had been turned off since 1997 and that in April of 1998, GTE built a 12–foot high fence between the Building and the Pascouets' property, so that the workers could not look over the fence into the Pascouets' backyard. Also, in April of 1998, GTE moved the air conditioners to the other side of the Building so that they were farther away. Mr. Pascouet testified that there was no longer a light problem or a problem with GTE workers looking over the fence into the Pascouets' backyard. While the jury has considerable discretion to determine how much, if any future damages to award, the standard of review is not so nebulous that a reviewing court will uphold a jury award for future damages when there was no evidence to support it. *See Whole Foods Market Southwest,* 979 S.W.2d at 781–82. Mr.

Pascouet did testify in a conclusory manner that he believes that the tower will be a continuing nuisance; however, he did not explain what he meant by this. He did not testify that the Tower would continue to cause Mr. and Mrs. Pascouet to suffer loss-of-use-and-enjoyment damages or that there is a reasonable probability that the Pascouets will suffer these damages. Considering only the evidence favorable to the Pascouets and the reasonable inferences therefrom, we find that there was no evidence of a reasonable probability that the Pascouets would incur future loss-of-use-and-enjoyment damages. Therefore, we sustain GTE's fourth issue to the extent that we hold the Pascouets may not recover for future loss-of-use-and-enjoyment damages. *See Rosenboom Mach. & Tool,* 995 S.W.2d at 828; *Whole Foods Market Southwest,* 979 S.W.2d at 781–82. In all other respects, we overrule GTE's fourth issue.

## Was the Evidence Legally and Factually Sufficient to Support the Jury's Invasion–of–Privacy Findings?

In its fifth issue, GTE argues that there was no evidence to support the jury's findings of mental anguish caused by GTE's intentional intrusion on the Pascouets' solitude, seclusion or private affairs in a way that would be highly offensive to persons with reasonable and ordinary sensibilities. We agree and hold that the Pascouets may not recover for invasion of privacy on this record.

In determining whether there was any evidence that supports the jury's findings of liability and damages for invasion of privacy, we consider only the evidence and reasonable inferences therefrom that support these findings. *Texarkana Memorial Hosp., Inc.,* 946 S.W.2d at 838. Unreasonable inferences do not constitute some evidence to support this claim.

*Hammerly Oaks, Inc.,* 958 S.W.2d at 392. The only viable invasion-of-privacy theory that the Pascouets have is their claim that GTE servicemen have intentionally intruded on the Pascouets' seclusion and solitude in a way that would be highly offensive to persons with reasonable and ordinary sensibilities, causing mental anguish. The only evidence in the record of possible liability under this theory is as follows:

### Testimony of Mr. Pascouet

Q. How often over the last four years have maintenance men visited the site and looked into your property?

A. We can talk only [sic] the time we have seen them because we could be out of the house and we did not see them, of course; but at a point it was really often.

. . .

Q. Do you believe that it [the Tower] will continue to invade your privacy?

A. Oh, yes.

. . .

Q. The 12–foot fence that GTE built keeps people from looking at you from the building, doesn't it?

A. Yes.

Q. So there's no peeping problem any more?

A. No.

. . .

Q. Do men still climb up that tower?

A. Yes, of course.

### Testimony of Mrs. Pascouet

Q. Did GTE maintenance men visit the site both during the day and at night?

A. Yes. It's always been like that, but in the beginning it was a lot more because they were in the process of installing their equipment and they spent a lot of time there.

Q. And would these GTE maintenance men look over into your backyard when you were out there?

A. Yes.

Q. And this has gone on now for over four years?

A. Yes, four and a half years.

Q. Has the GTE tower and building caused you any distress?

A. Yes.

. . .

Q. Mrs. Pascouet, what effect has this tower had on you?

A. I was very distressed. I cried a lot because of this affair, and I was not interested in living there anymore. I just wasn't interested in living there.

The invasion-of-privacy tort is typically associated with either a physical invasion of a person's property or eavesdropping on another's conversation with the aid of wiretaps, microphones, or spying. *Gill v. Snow,* 644 S.W.2d 222, 224 (Tex.App.— Fort Worth 1982, no writ), *overruled on other grounds by Cain v. Hearst Corp.,* 878 S.W.2d 577 (Tex.1994). Considering only the evidence and reasonable inferences therefrom that support the jury's finding of invasion of privacy, we hold there was legally insufficient evidence of conduct by GTE employees that was highly offensive to a reasonable person. *Id.* The mere fact that maintenance workers come to an adjoining property as part of their work and look over into the adjoining yard is legally insufficient evidence of highly offensive conduct. There was no evidence of how often these workers looked, how long, what or who they spied, or even what the Pascouets were doing when the peering apparently progressed. There was legally insufficient evidence that the GTE maintenance workers engaged in highly offensive conduct.

Even had there been some evidence establishing liability for invasion of privacy, there would still be a dearth of evidence of any mental anguish caused by the alleged invasion of privacy by GTE. Mr. Pascouet testified that he never got physically ill due to the Building and Tower and that he never missed a day of work because of these matters. The Pascouets testified that the Building and Tower have caused them anger, stress, distress, anguish, disappointment in Bunker Hill, fear, lost sleep, worry, and embarrassment. The alleged invasion of privacy by GTE was not the stated cause of their anxiety. The jury awarded the Pascouets damages for mental anguish in the past and, in reasonable probability, in the future.

We find that there was no legally sufficient evidence to support the jury's mental anguish awards. In *Parkway Co. v. Woodruff*, 901 S.W.2d 434 (Tex. 1995), the Supreme Court held that "an award of mental anguish damages will survive a legal sufficiency challenge when the plaintiffs have introduced direct evidence of the nature, duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiffs' daily routine." *Id.* at 444. Courts should "closely scrutinize" awards of mental anguish damages. *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 54 (Tex.1997). After close scrutiny of the evidence in this record and the standard for mental anguish, we hold that there was no evidence to support the jury's mental anguish awards. *Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 860–61 (Tex.1999); *Phar–Mor, Inc. v. Chavira*, 853 S.W.2d 710, 712–13 (Tex. App.—Houston [1st Dist.] 1993, writ denied) (no evidence of mental anguish damages in invasion-of-privacy case). There-

fore, we sustain GTE's fifth issue and hold that the Pascouets take nothing on their invasion-of-privacy claims.

## Was GTE Entitled to a Pro–Rata Settlement Credit Due to the Pascouets' Settlement with Bunker Hill?

In its sixth issue, GTE argues that the trial court erred by denying GTE the pro-rata settlement credit of $486,500 that it requested under Chapter 32 of the Texas Civil Practice and Remedies Code. We hold that the trial court correctly denied this settlement credit. At trial, the Pascouets argued that Chapter 32 of the Texas Civil Practice and Remedies Code applied to this case. GTE, however, filed a written election seeking the protections of § 33.012(a)—a reduction in the amount of damages to be recovered by the claimant by a percentage equal to the claimant's percentage of responsibility, unless the claimant is barred from recovering because his percentage of responsibility is greater than fifty percent. *See* TEX. CIV. PRAC. & REM.CODE § 33.012(a). GTE stated that it made this election under TEX. CIV. PRAC. & REM.CODE § 33.014, indicating that, according to GTE, this case was governed by § 33.014, which covers settlement credits.[7] GTE also requested and received comparative-responsibility questions in the jury charge, which resulted in mitigation of GTE's liability in the trial court.

In two post-verdict motions, GTE did seek a settlement credit under Chapter 32 of the Texas Civil Practice and Remedies Code; however, GTE did not seek this relief until after the jury had returned its verdict based on a comparative-responsibility charge under Chapter 33. GTE did not indicate to the trial court that it believed Chapter 32 applied until its post-

---

7. GTE's election is puzzling because there is nothing in § 33.014 about electing the protections of § 33.012(a). Nonetheless, in its elec-

tion, GTE did indicate to the trial court that it believed this case to be governed by TEX. CIV. PRAC. & REM.CODE §§ 33.012(a) & § 33.014.

verdict motions. We hold that GTE is bound by its election and other conduct in the trial court so that the only possible source of a settlement credit would be Chapter 33—not the pro-rata credit that GTE seeks under Chapter 32. *General Chemical Corp. v. De La Lastra*, 852 S.W.2d 916, 919 (Tex.1993); *Owens–Corning Fiberglas Corp. v. Schmidt*, 935 S.W.2d 520, 523 (Tex.App.—Beaumont 1996, writ denied). GTE has not requested a Chapter 33 settlement credit on appeal; had GTE done so it would have been equally fruitless because GTE did not preserve error by requesting this settlement credit below.[8] Tex.R.App. P. 33.1. Therefore, we overrule GTE's sixth issue.

### Did the Trial Court Err by Denying the Pascouets' Requests for Injunctive and Declaratory Relief?

■■■■ In their first issue on cross-appeal, the Pascouets assert that the trial court clearly abused its discretion by denying their application for a permanent injunction requiring GTE to stop the nuisance and to comply with the Bunker Hill zoning ordinances. Injunctive relief is proper where the applicant demonstrates the following four grounds for relief: 1) the existence of a wrongful act; 2) the threat of imminent harm; 3) the existence of irreparable injury; and 4) the absence of an adequate remedy at law. *Hues v. Warren Petroleum Co.*, 814 S.W.2d 526, 529 (Tex.App.—Houston [14th Dist.] 1991, writ denied). The question of whether a threat of imminent harm exists to warrant injunctive relief is a legal question for the court—not a factual question for the jury. *State v. Texas Pet Foods, Inc.*, 591 S.W.2d 800, 803–4 (Tex.1979) ("The jury does not

determine the expediency, necessity, or propriety of equitable relief ... The determination of whether to grant an injunction based upon the ultimate issues of fact found by the jury is for the trial court, exercising chancery powers"). The trial court had discretion, under its chancery powers, to deny the Pascouets' application for a permanent injunction. *Hues*, 814 S.W.2d at 529. The grant or denial of a permanent injunction is within the sound discretion of the trial court, and the trial court's action will not be disturbed on appeal absent a clear abuse of discretion. *Id.* A clear abuse of discretion in denying injunctive relief arises only when the trial court's decision is not supported by some evidence of substantial and probative character. *Morris v. Collins*, 881 S.W.2d 138, 140 (Tex.App.—Houston [1st Dist.] 1994, writ denied).

■■■ The Pascouets argue that the trial court clearly abused its discretion by refusing to permanently enjoin GTE from keeping the Building and Tower in their current location because, the Pascouets assert, the Building and Tower are a continuing nuisance. We conclude that the trial court's decision was supported by some evidence of substantial and probative character and therefore was not an abuse of discretion. *Morris*, 881 S.W.2d at 140. As we have already discussed, there was substantial evidence from the Pascouets themselves to the effect that GTE has abated the nuisance. Mrs. Pascouet did not testify as to whether she believed there would be a continuing nuisance in the future. Mr. Pascouet did state in a conclusory manner that he believed that the Tower will be a continuing nuisance;

---

8. Because GTE never made an election between the dollar-for-dollar settlement credit and the sliding-scale settlement credit, GTE would have been deemed to have elected the sliding-scale settlement credit of Tex. Civ. Prac. & Rem.Code § 33.012(b)(2). *See* Tex. Civ. Prac. & Rem.Code §§ 33.012(b) & 33.014. GTE never requested this settlement credit in the trial court.

however, he did not provide any facts to indicate why he believes there would be a continuing nuisance. Further, Mr. Pascouet testified that, starting sometime in 1997, GTE had turned the lights near the Building off so that "there is no light problem now." Mr. Pascouet also agreed that "there's no peeping problem any more" because, in April of 1998, GTE built a 12–foot high fence between the Building and the Pascouets' property line so that the GTE workers could not look over the fence into the Pascouets' backyard. Also, in April of 1998, GTE moved the air conditioners to the other side of the Building so that they are farther away from the Pascouets' property. While Mr. Pascouet testified that GTE workers were still coming over to climb the Tower, he did not state how often the workers climb the Tower. There was also no testimony that any GTE workers engaged in "peeping" while they were climbing the Tower; their "peeping" was over the fence which apparently ceased when the fence was raised. The trial court heard substantial evidence to support the conclusion that there was no longer a threat of imminent harm to the Pascouets from any common-law nuisance relating to the Building and the Tower. Therefore, the trial court did not abuse its discretion by denying injunctive relief in this regard.

The Pascouets also requested that the trial court do the following: (1) declare GTE, the Tower, and the Building to be in violation of the Bunker Hill zoning ordinances, and (2) enjoin GTE from violating the Bunker Hill zoning ordinances, including a mandatory injunction to move the Tower and Building at GTE's expense. In their first and second issues on cross-ap-

peal, the Pascouets assert that the trial court erred by denying these requests for declaratory[9] and injunctive relief. At times in their briefs, the Pascouets indicate that GTE could move the Tower and the Building to another location on the Municipal Complex, away from the Pascouets' property line. However, the Pascouets requested an injunction against GTE from all future violations of the Bunker Hill zoning ordinances, and, under the Pascouets' interpretation of these ordinances, GTE could not put the Tower anywhere in Bunker Hill, including in the Municipal Complex.

Bunker Hill enacted its zoning ordinances under Chapter 211 of the Texas Local Government Code. *See* Tex. Local Gov't Code § 211.001, *et seq.* A violation of an ordinance enacted under Chapter 211 is a misdemeanor offense. Tex. Local Gov't Code § 211.012(b). As allowed by § 211.012(b), the Bunker Hill zoning ordinances provide that each day of each violation of the zoning ordinances is a separate misdemeanor. *Id.* These ordinances also provide that, upon conviction of each misdemeanor, the defendant shall be fined not more than $2,000 for each offense.

■ The Pascouets argue that the trial court could have issued an injunction under Tex. Local Gov't Code § 211.012(c). We disagree. Under the unambiguous language of this statute, only Bunker Hill may enforce its zoning ordinances. *See* Tex. Local Gov't Code § 211.012(c). While the Pascouets did sue Bunker Hill in this case, they dismissed their claims against Bunker Hill before trial. By seeking their injunctive and declaratory relief regarding the Bunker Hill ordinances, the Pascouets tried to usurp the authority given by the

---

9. At one point in their brief, the Pascouets seem to indicate that the trial court refused to render a declaratory judgment under Tex. Civ. Prac. & Rem.Code Ann. § 37.008 (Vernon 1997).

However, we interpret the trial court's judgment as denying the declaratory relief on the merits rather than under § 37.008.

legislature to Bunker Hill to enforce its own zoning ordinances through criminal prosecutions or injunctive relief under § 211.012(c). In fact, the Pascouets requested in their petition that the $2,000 fine for each criminal violation should be awarded to the Pascouets—rather than to Bunker Hill—because Bunker Hill "wholly abrogated its responsibilities with regard to zoning enforcement against GTE's Tower and equipment building." Under the applicable statutes, only Bunker Hill may enforce its zoning ordinances; the Pascouets may not do so. *See* TEX. LOCAL GOV'T CODE § 211.012. Therefore, we hold that the district court properly denied the Pascouets' requests for injunctive and declaratory relief regarding the Bunker Hill zoning ordinances.[10]

██ In any event, the trial court had additional grounds to deny the Pascouets' requests for injunctive and declaratory relief. The Pascouets asked the trial court for relief that would prevent GTE from having a tower anywhere in Bunker Hill, even though the evidence showed that there was a gap in GTE's cellular phone coverage. However, under the FTA, "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof ... shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 253 & 332(c)(7)(B)(i). While the FTA did not preempt the Pascouets' claims for nuisance and invasion of privacy, this provision of the FTA preempted state law and bound the trial court. If the trial court granted the Pascouets' requests for injunctive and declaratory relief regarding the zoning or-

dinances, this relief might have had the effect of prohibiting the provision of personal wireless services in violation of the FTA. The trial court did not err by denying the Pascouets' requests for injunctive and declaratory relief as to the Bunker Hill zoning ordinances. Therefore, we overrule the Pascouets' first and second issues on cross-appeal.

## Conclusion

The FTA does not preempt the Pascouets' common-law damage claims. GTE did not preserve error regarding its complaints about the admission of evidence relating to the zoning ordinances. GTE either failed to preserve error or there was no reversible error regarding Coker's testimony. The evidence was legally and factually sufficient to support the Pascouets' recovery of nuisance damages for loss of market value and past loss of use and enjoyment of their property. There was legally insufficient evidence of future loss-of-use-and-enjoyment damages and of liability and damages for the invasion-of-privacy claim. GTE was not entitled to a settlement credit under Chapter 32 of the Texas Civil Practice and Remedies Code.

The trial court did not err by denying the Pascouets' requests for injunctive and declaratory relief because of the lack of evidence that there was an on-going nuisance that needed to be enjoined, because only municipalities can enforce violations of their zoning ordinances under TEX. LOCAL GOV'T CODE § 211.012(c), and because, under the FTA, state regulation may not prohibit or have the effect of prohibiting the provision of personal wireless services. Therefore, we reverse the following portions of the trial court's judgment: (1) the

---

10. It should also be noted that the statute under which the Bunker Hill zoning ordinances were enacted "does not apply to a building, other structure, or land under the control, administration, or jurisdiction of a state or federal agency." TEX. LOCAL GOV'T CODE § 211.013(c).

award to the Pascouets of $540,000 for future nuisance damages; (2) the liability judgment and damages to the Pascouets of $157,500 for invasion-of-privacy; and (3) the portion that awarded the Pascouets prejudgment and postjudgment interest on the foregoing amounts. We render judgment that the Pascouets take nothing on their invasion-of-privacy claims and on their claims for future nuisance damages. We affirm the portions of the trial court's judgment awarding the Pascouets the following relief against GTE: (1) $208,000 in actual damages for past nuisance damages plus $114,884.29 in prejudgment interest[11] and (2) postjudgment interest on the Pascouets' remaining recovery at the rate of ten percent per annum compounded annually from June 21, 1999 until the judgment is paid. We also affirm the trial court's denial of the Pascouets' requests for injunctive and declaratory relief.

11. On appeal, GTE has not challenged the trial court's award of prejudgment interest, so we have adjusted the trial court's prejudgment interest award in proportion to the remaining amount of actual damages.