

# Fourth Court of Appeals

## San Antonio, Texas

## OPINION

No. 04-14-00650-CV

Michael A. **CERNY** and Myra L. Cerny, Individually,
and as Next Friends of Cameron A. Cerny, a Child,
Appellants

v.

**MARATHON OIL CORPORATION**, Marathon Oil EF LLC,
and Plains Exploration & Producing Company,
Appellees

From the 218th Judicial District Court, Karnes County, Texas
Trial Court No. 13-05-00118-CVK
Honorable Stella Saxon, Judge Presiding

Opinion by:    Rebeca C. Martinez, Justice
Concurring & Dissenting Opinion by:  Luz Elena D. Chapa, Justice

Sitting:       Sandee Bryan Marion, Chief Justice
               Rebeca C. Martinez, Justice
               Luz Elena D. Chapa, Justice

Delivered and Filed:  October 7, 2015

AFFIRMED

Michael A. Cerny and Myra L. Cerny, individually, and as next friends of their minor son

Cameron A. Cerny (collectively, the Cernys) sued Marathon Oil Corporation[1] and Marathon Oil

EF, LLC (Marathon), as well as Plains Exploration & Production Company (Plains), for private

---

[1] Marathon Oil Corporation was dismissed from the suit on the ground that it was not the owner or operator of the subject oil and gas facilities.

nuisance and negligence claims asserting that toxic emissions from oil and gas operations in the Eagle Ford Shale near their home in Karnes County caused damage to their health and their property. The trial court granted the defendants' motions for summary judgment and rendered judgment that the Cernys take nothing. We affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The Cernys moved to a "fixer-upper" home on a one-acre tract of land in Karnes County in 2002. In 2010, the Cernys leased the mineral rights to Marathon's predecessor in exchange for a lease bonus and royalty interest. The lease and subsequent addendum authorized Marathon to utilize the surface of the Cernys' land for oil and gas operations and to drill horizontal wells. The Cernys' lease was pooled with other leases to create a larger drilling unit named the Brysch-Adams Unit. In 2012, Marathon drilled its first horizontal well on the Brysch-Adams Unit; the unit now contains three wells. Marathon has not placed any wellheads or infrastructure on the surface of the Cernys' property. The Cernys receive consistent royalty payments from the sale of production from the Brysch-Adams Unit.

In 2013, the Cernys filed suit against Marathon and Plains alleging that their negligent oilfield operations subjected them to toxic chemicals and noxious odors that worsened their existing health problems, caused new health problems, and damaged their property by creating sinkholes and damaging the home's pier and beam foundation. The Cernys' Fourth Amended Petition, which the parties agree is the live petition, asserted that "[w]ith the arrival of the technology to capture hydrocarbons in shale formations, came an influx of oilfield activity into Karnes County, Texas, in the heart of the Eagle Ford Shale," consisting of "[p]roduction operations, including drilling, completions, workovers, testing, processing, and other oilfield activities." The Cernys alleged that, by early 2012, their property was "completely surrounded" by Marathon's wells and Plains' production facilities which emitted noxious odors and chemicals

and created constant traffic, dust, and noise, all of which radically altered their previously peaceful, rural lifestyle. The Cernys alleged that the complained of well sites and facilities are in the vicinity, or "within a short distance," of their property; they also alleged that fracking operations have occurred "within three miles" of the Cerny residence. The Cernys pled causes of action for private nuisance, negligence, gross negligence, and negligence per se.

In their petition, the Cernys specifically disclaimed that they were seeking "any 'personal injury damages' that would invoke [the need for expert testimony under] *Merrell Dow Pharms. v. Havner*" and its progeny. *See Merrell Dow Pharms. v. Havner*, 953 S.W.2d 706 (Tex. 1997). The Cernys further "disclaim[ed] any and all claims seeking recovery for a diagnosed 'disease' that also occurs genetically and for which a large percentage of the causes are unknown." They stressed that they "do NOT seek recovery in damages for defendants' actions having caused the particular 'disease.'" The Cernys' petition did not identify their pre-existing diseases and physical symptoms, and did not identify the exacerbated conditions or new "symptoms" which they allege were caused by the defendants' conduct. The Cernys characterized the damages sought as:

- Compensation for "(a) reasonable and necessary medical expenses incurred in the past for treatment due to the defendants' conduct; (b) reasonable and necessary medical expenses [which] are likely to be incurred in the future due to defendants' conduct; (c) loss of earning capacity."

- "[R]ecovery for their symptoms which are typical of discomfort rather than disease" due to past and future "fear, apprehension, offense, discomfort, annoyance, sickness, injury to health, exacerbation of physical health or pre-existing condition, harm from assault on plaintiffs' senses, nausea, loss of peace of mind, emotional harm or distress, inconvenience, and deprivation of enjoyment of their property." They allege these damages also include (i) past and future physical pain and suffering, (ii) past and future mental pain or anguish, (iii) disfigurement, (iv) loss of enjoyment of life, and (v) loss of use of their property.

- Remediation damages to repair damage to the structure of the home.

- Loss of market value of the property due to sinkholes, chemical pollution, noxious odors, dead trees, and dead animals on the property.

- Punitive damages (re: gross negligence).

Marathon and Plains filed no-evidence and traditional motions for summary judgment asserting there was no evidence, and no issue of material fact, under the *Havner* standard on all the elements of the claims asserted by the Cernys. While the defendants asserted in their summary judgment motions that the Cernys could not prove *any* of the elements of their claims, they especially focused on the element of causation common to all of the Cernys' causes of action.

The Cernys filed a response which attached summary judgment evidence consisting primarily of: (1) the affidavits of Michael, Myrna, and Cameron Cerny stating their personal observations about the nearby oilfield operations, their health symptoms and loss of enjoyment, and the property damage, and drawing inferences as to the connections; (2) the affidavit of Sharon Wilson, a lay person working with Earthworks who took videos of gas plumes at a Plains facility and a Marathon facility near the Cerny home and air canister samples showing the presence of the same six hazardous substances at the Plains facility and at the Cerny home; (3) the affidavit, report, and supplemental report of Keith Zimmerman, P.E., an air quality expert who conducted air dispersion modeling of a "documented upset condition" at the nearby Marathon Yosko site and air modeling of the permitted emissions levels at three other Marathon facilities near the Cerny home, and found that hazardous compounds were carried on to the Cerny property during the five-week emissions event and that the other three Marathon facilities[2] exceeded federal ambient air quality standards, thereby potentially exposing the Cernys to excessive nitrogen dioxide; (4) the affidavit, report, and supplemental report of David L. Mitchell, Ph.D., a forensic meteorologist who performed air dispersion modeling of emissions on 22 well sites within one and one-half miles of

---

[2] Marathon's North Longhorn, East Sugarloaf, and East Longhorn facilities

the Cerny property using "pseudo-point" source points ("open air mud pits, open air shaker assemblies, open air storage of formation cuttings, and emissions from tanks, valves, and connections") to represent the combined emissions, and found that a significant amount of chemical compounds, including benzene, have impacted the Cerny property in excess of four times the TCEQ[3] annual standard for benzene; and (5) the affidavit, report, and supplemental report of Thomas Dydek, Ph.D., a toxicologist who based his conclusions on the Mitchell and Zimmerman reports, plus data from the Cerny family, documents generated during the litigation, and his personal observations, and opined that the Cernys face an increased risk of cancer from the elevated benzene exposure found by Mitchell and that they have "very likely" been exposed to the excessive levels of nitrogen dioxide found by Zimmerman while traveling on FM 99 past Marathon's East Longhorn facility.

Marathon and Plains filed motions to strike the majority of the Cernys' summary judgment evidence as inadmissible hearsay, unqualified lay opinions, and unreliable, speculative, and conclusory expert opinions. *See* TEX. R. EVID. 701, 702-03, 802. The trial court granted the defendants' motions to strike in their entirety, thereby striking the bulk of the Cernys' summary judgment evidence, leaving only the child Cameron Cerny's affidavit, and the affidavits (unsupported by the stricken reports) of the experts Zimmerman and Mitchell. The trial court then granted both the no-evidence summary judgment motions and the traditional summary judgment motions filed by Marathon and Plains.

The Cernys now appeal, raising two main issues: (1) whether the trial court erred in granting the defendants' no-evidence and traditional summary judgments on all the Cernys' causes

---

[3] Texas Commission on Environmental Quality

of action; and (2) whether the trial court abused its discretion in striking the majority of the Cernys' summary judgment evidence.

## NO-EVIDENCE SUMMARY JUDGMENT

***Standard of Review.*** We review a trial court's grant or denial of summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). On appeal, the court reviews a no-evidence summary judgment first, and then proceeds to address a traditional summary judgment only if necessary. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). If the court affirms the no-evidence summary judgment motion, it need not address the traditional summary judgment. *Id.*

A no-evidence summary judgment is essentially a directed verdict granted before trial, to which we apply a legal sufficiency standard of review. *King Ranch*, *Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003). A no-evidence motion for summary judgment must be granted if, after an adequate time for discovery, the moving party asserts that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial and the non-movant fails to produce more than a scintilla of summary judgment evidence raising a genuine issue of material fact on those elements. TEX. R. CIV. P. 166a(i); *Medistar Corp. v. Schmidt*, 267 S.W.3d 150, 157 (Tex. App.—San Antonio 2008, pet. denied). No evidence exists when there is (i) a complete absence of evidence of a vital fact, (ii) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (iii) the evidence offered to prove a vital fact is no more than a mere scintilla, or (iv) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *see Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995) (more than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions"). We view the summary judgment evidence

in the light most favorable to the non-movant, indulging every reasonable inference and resolving any doubts in the non-movant's favor. *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002).

### *Necessity of Expert Testimony*

As noted, both Marathon and Plains filed no-evidence summary judgment motions asserting there was no evidence of *any* of the elements of the causes of action pled by the Cernys. The defendants chiefly stressed that there was no evidence their particular oilfield operations caused the Cernys' damages under any of their claims. We will thus focus our no-evidence analysis on the element of causation, which is common to all the Cernys' claims and which is the main element in dispute.[4] *See Texas Pattern Jury Charges: General Negligence, Intentional Personal Torts*, PJC 2.4, 2.4 cmt., 12.5 (2012) (providing dentical "proximate cause" instructions for negligence, negligence per se, and nuisance claims); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11) (West 2015) (defining gross negligence).

Before we turn to the summary judgment evidence, we must resolve the disputed issue of whether the strict causation standards of *Havner* apply to the Cernys' claims, specifically whether expert testimony was necessary to create a fact issue on the causation element of their nuisance and negligence claims. In determining whether expert evidence is necessary, we apply a de novo standard of review. *FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 89-90 (Tex. 2004).

On appeal, the Cernys argue their summary judgment evidence consisting of lay affidavits and non-medical expert testimony was sufficient to raise a scintilla of evidence on the challenged element of causation for all their causes of action. They dispute that the strict causation standard

---

[4] Although the Cernys challenge the specificity of portions of the defendants' no-evidence summary judgment motions, the Cernys concede that the no-evidence motions sufficiently challenged the causation elements of their claims. Therefore, we need not address the Cernys' procedural challenges to the no-evidence summary judgment motions which they raise on appeal.

of *Havner* applies to their claims, arguing instead that they can establish causation under general common law standards for negligence and nuisance. They acknowledge the general rule that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of lay persons. *See Guevara v. Ferrer*, 247 S.W.3d 662, 665 (Tex. 2007). The Cernys assert, however, that they were not required to present medical expert testimony to prove causation of their physical injuries, whether new health conditions or exacerbations of pre-existing health conditions, because their petition disclaimed recovery for any "'personal injury damages' that would invoke *Merrell Dow Pharms. v. Havner*," and only sought recovery for nuisance "'symptoms' typical of discomfort rather than disease." In support, the Cernys rely on the following language from *Schneider Nat'l Carriers, Inc. v. Bates*, a nuisance case, arguing it is dispositive of the expert testimony issue: "[T]he affidavit submitted by [the plaintiff's] medical expert . . . allege[s] causation only as to symptoms typical of discomfort rather than disease, thus alleging nuisance damages rather than personal injury [damages]." *Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 269 (Tex. 2004). However, that language is non-binding dicta and is quoted out of context; further, the *Schneider* plaintiffs had an affidavit by a medical expert who opined on causation. *See id. Schneider* dealt with whether the alleged nuisance was temporary or permanent for purposes of determining when the claim accrued and whether it was barred by limitations. *Id.* at 268, 270-75. It did not address the question of whether a medical expert was required to prove that the plaintiffs' health problems, whether characterized as "symptoms" or "personal injuries," were caused by the alleged industrial emissions.

The Cernys also rely on *Morgan v. Compugraphic Corp.* to support their position that no medical expert was necessary to raise a fact issue on the causal link between their "symptoms," new and exacerbated, and the defendants' oilfield operations because determining the causal nexus between the two was within a lay person's knowledge and experience. *See Morgan v.*

*Compugraphic Corp.*, 675 S.W.2d 729, 733 (Tex. 1984) (holding that medical expert testimony on causation was not necessary where plaintiff's lay testimony established a direct, logical sequence of events between plaintiff's return to work and exposure to chemical fumes and her injuries from which the jury could infer a causal nexus with reasonable probability). The Supreme Court has clarified that *Morgan* provides a limited exception to the general rule requiring a medical expert on causation of a medical condition, and applies only where "both the occurrence and conditions complained of are such that the general experience and common sense of laypersons are sufficient to evaluate the conditions and whether they were probably caused by the occurrence." *Guevara*, 247 S.W.3d at 668 (providing the example of an automobile collision and the new condition of a bone fracture or other "similar basic condition," which did not previously exist, as the type of causal connection that falls within a layperson's general experience and common sense). In *City of Laredo v. Garza*, we relied on *Guevara* and framed the *Morgan* analysis as "whether the evidence established a sequence of events that provided a strong, logically traceable connection between [the plaintiff's] on-the-job accident and his injuries sufficient to support a causation finding between his accident and his 'basic physical conditions' (his injuries) that (1) are within the common knowledge and experience of laypersons, (2) did not exist before the accident, (3) appeared after and close in time to the accident, and (4) are within the common knowledge and experience of laypersons caused by the kind of accident [the plaintiff] suffered." *City of Laredo v. Garza*, 293 S.W.3d 625, 631 (Tex. App.—San Antonio 2009, no pet.). The facts of this case are easily distinguishable from the facts in *Morgan* where a previously healthy plaintiff provided testimony showing a "strong, logically traceable connection" and temporal link between the event and the condition which did not previously exist. *See Morgan*, 675 S.W.2d at 733. Here, all three of the Cernys admittedly suffered from a wide range of physical and emotional conditions before the defendants commenced their oilfield operations; their home had previous foundation

problems as well. Further, the temporal proximity between the event and the condition that existed in *Morgan* is absent here. *See Guevara*, 247 S.W.3d at 668 (while temporal proximity alone does not support an inference of medical causation, it is relevant to the causation issue). The facts alleged in the Cernys' petition do not fall within the *Morgan* exception. *See id.* at 667; *see also Garza*, 293 S.W.3d at 631-32 (holding expert medical testimony was required where temporal proximity was lacking and there were other possible causes of plaintiff's back injury).

Marathon and Plains argue that the Cernys' nuisance and negligence claims are in the nature of toxic tort claims which fall outside a lay person's general knowledge and experience, and must therefore be proven with expert testimony. *See Fulgham*, 154 S.W.3d at 90-91 (in determining whether expert testimony is necessary, courts consider whether the alleged conduct involves the use of specialized equipment or techniques unfamiliar to the ordinary person); *see also Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982). We agree. The Cernys pled for damages arising out of their exposure to emissions of "noxious gases and chemicals," including benzene and nitrogen dioxide, from oil well sites and production facilities and from the migration of such hazardous materials on to their property. Plaintiffs seeking relief for injuries of any nature caused by exposure to or migration of a toxic substance must meet the stringent proof requirements imposed by the Texas Supreme Court in *Havner* and its progeny. *See Havner*, 953 S.W.2d at 715-16, 720 (expert testimony is necessary in a toxic tort case in order to prove (i) the applicable standard of care, (ii) that the defendant's conduct more than doubled the risk, as shown by two epidemiological studies, (iii) that the plaintiff's injuries were caused by the defendant's conduct, and (iv) that the plaintiff's injuries were not caused by other possible sources); *see also Bostic v. Georgia-Pacific Corp.*, 439 S.W.3d 332, 347-50 (Tex. 2014); *Merck & Co., Inc. v. Garza*, 347 S.W.3d 256, 259, 265-66 (Tex. 2011); *Borg-Warner Corp. v. Flores*, 232 S.W.3d 765, 770-71 (Tex. 2007).

We have previously applied *Havner*'s requirements for expert testimony in a lead contamination case in which the plaintiffs brought claims for negligence and nuisance, among other claims. *See Martinez v. City of San Antonio*, 40 S.W.3d 587, 593-95 (Tex. App.—San Antonio 2001, pet. denied) (concluding the plaintiff's experts failed to meet the *Havner* standards on causation and upholding the no-evidence summary judgment). In addition, the Waco Court of Appeals has applied the *Havner* standards requiring expert testimony on causation to nuisance and negligence claims based on oil and gas emissions similar to the Cernys' claims. *See Baker v. Energy Transfer Co.*, No. 10-09-00214-CV, 2011 WL 4978287, at *5-7 (Tex. App.—Waco Oct. 19, 2011, pet. denied) (mem. op.) (affirming no-evidence summary judgment on nuisance and negligence claims in toxic exposure case and stating "[t]he requirement of expert testimony in this case is obvious"). The requirement of expert testimony is equally obvious in this case where the Cernys' claims arise out of the alleged emissions and migration of hazardous substances from nearby oil and gas operations. We therefore conclude that the strict causation standards of *Havner* apply to the Cernys' claims.

Absent direct, scientifically reliable proof of actual causation, *Havner* requires the proponent of causation testimony in the toxic tort context to demonstrate that exposure "more likely than not" caused the injury by pointing to at least two epidemiological studies demonstrating a statistically significant doubling of the risk as proof of general causation.[5] *Havner*, 953 S.W.2d at 714-15 (causation has two components: general and specific causation); *Merck*, 347 S.W.3d at 265-66 (epidemiological evidence showing a statistically significant doubling of the risk is a threshold requirement of reliability under *Havner* standard for general causation); *Bostic*, 439

---

[5] "Epidemiological studies examine existing populations to attempt to determine if there is an association between a disease or condition and a factor suspected of causing that disease or condition." *Havner*, 953 S.W.2d at 715. Epidemiological studies only show an "association," and cannot establish the actual cause of a person's injury or condition. *Id.* at 715-18.

S.W.3d at 347 (explaining that *Havner* offers an alternative method of establishing causation in cases where there is no direct, scientifically reliable proof of causation). To raise a fact issue on causation under *Havner*, a toxic tort plaintiff must not only present competent evidence of a doubling of the risk through epidemiological studies, the plaintiff must also present evidence that he or she is similar to the subjects in the studies. *Havner*, 953 S.W.2d at 720; *Merck*, 347 S.W.3d at 265. Proof is required that the plaintiff was exposed to the same substance as in the epidemiological studies, that the plaintiff's exposure or dose level was comparable to or greater than those in the studies, that the plaintiff's exposure occurred before the onset of injury, and that the timing of the onset of the plaintiff's injury was consistent with that experienced by those in the study. *Havner*, 953 S.W.2d at 720; *Borg-Warner*, 232 S.W.3d at 771-73 (evidence of the dose level or quantum of the plaintiff's exposure is a critical causation factor, as evidence of merely "some" exposure is insufficient); *Bostic*, 439 S.W.3d at 340-42 (rejecting the "any exposure" theory). As to specific causation, "[d]efendant-specific evidence relating to the approximate dose to which the plaintiff was exposed, coupled with evidence that the dose was a substantial factor in causing the . . . disease, will suffice." *Borg-Warner*, 232 S.W.3d at 772; *see also Bostic*, 439 S.W.3d at 343-44 (noting that the tort standard of cause-in-fact is incorporated within the more general substantial factor causation used in toxic tort cases). Finally, *Havner* also requires the plaintiff to present evidence excluding other plausible causes of the injury with reasonable certainty. *Havner*, 953 S.W.2d at 720; *Merck*, 347 S.W.3d at 265-66.

### *Causation Evidence*

In order to survive the defendants' no-evidence summary judgments on the causation element of their claims, the Cernys had to present more than a scintilla of probative expert evidence to create a material fact issue on each of the *Havner* causation prongs discussed above. Even considering all of the Cernys' summary judgment evidence, including the expert evidence struck

by the trial court, we conclude they failed to do so. None of the Cernys' experts presented any evidence excluding other potential causes of the Cernys' alleged injuries and property damage; they did not exclude alternative causes to "a reasonable certainty" as required by *Havner*. *See Havner*, 953 S.W.2d at 720. It was undisputed that each of the Cernys suffered from multiple chronic health conditions that existed prior to the defendants' commencement of oilfield operations. Further, it was similarly undisputed that the Cerny's home had foundation damage prior to the defendants' operations. The record also shows that Marathon and Plains are not the only companies conducting oil and gas operations in the vicinity of the Cerny home; therefore, other companies' emissions are plausible potential causes of the Cernys' personal injuries and property damage. The Cernys did present expert testimony that excessive levels of benzene, nitrogen dioxide, and other hazardous chemicals were found to be present at the Cerny property, and that excessive levels of the same chemicals were found at three nearby Marathon facilities and one Plains facility. However, as we explained in *Martinez*, such evidence only shows that the plaintiffs had some exposure to chemicals found at the Marathon and Plains facilities; it does not negate other possible sources of the chemicals and thus constitutes no evidence of causation. *See Martinez*, 40 S.W.3d at 594-95 (even though evidence showed soil at the Alamodome construction site contained lead and that dust in the plaintiffs' homes contained lead, and the plaintiffs' expert concluded the lead dust "probably originated" from the Alamodome site, in the absence of expert evidence excluding other plausible causes of the lead exposure, the evidence of exposure constituted no evidence of causation by the defendant). An expert's failure to rule out alternative causes of injury renders the opinion unreliable, and legally constitutes no evidence. *See id.* at 593 (citing *Havner*, 953 S.W.2d at 711-12, 714).

In addition, while Dydek's supplemental report cited two epidemiological studies that show "excess risks" of certain symptoms complained of by the Cernys, i.e., headaches, nausea,

eye and throat irritation, in groups exposed to noxious chemical odors, there is no evidence showing the Cernys are similar to the subjects in the studies, or were exposed to similar doses as those in the studies. *See Havner*, 953 S.W.2d at 720; *see also Borg-Warner*, 232 S.W.3d at 771-73. In addition, without a medical expert, the Cernys had no evidence to show that their exposure to hazardous chemicals occurred before the onset or exacerbation of particular health symptoms or conditions. None of the Cernys' experts obtained or reviewed their medical records. No expert evidence was presented differentiating between the Cernys' pre-existing physical conditions and the new health problems they claim arose after the oilfield operations began near their home.

Causation cannot be established by mere speculation. *Martinez*, 40 S.W.3d at 592. To overcome the defendants' no-evidence summary judgment motion on causation, the Cernys had to present more than a scintilla of expert evidence that emissions from a Marathon and/or Plains facility caused their injuries and property damage and they failed to do so.

### *Loss-of-Use Damages*

As to the portion of the Cernys' nuisance claim seeking damages for loss of use and enjoyment of their land due to excessive dust, noise, traffic, and foul odors, we similarly conclude that they failed to raise a material fact issue on causation. The four elements of a private nuisance claim are: (1) the plaintiff had an interest in the land; (2) the defendant interfered with or invaded the plaintiff's interest by conduct that was negligent, intentional, or abnormal and out of place in its surroundings; (3) the defendant's conduct resulted in a condition that substantially interfered with the plaintiff's use and enjoyment of his land; and (4) the nuisance caused injury to the plaintiff. *Barnes v. Mathis*, 353 S.W.3d 760, 763 (Tex. 2011); *City of Tyler v. Likes*, 962 S.W.2d 489, 503-04 (Tex. 1997). Even considering the stricken lay witness affidavits about the foul odors, dust, noise, and traffic, the lay witness evidence does not amount to more than a scintilla of

evidence linking these particular defendants, Marathon and Plains, as the proximate cause of the conditions that substantially interfered with the Cernys' use and enjoyment of their property.

The affidavits by Mr. and Mrs. Cerny state that, "in early 2012, we found our property entirely surrounded by oilfield activities," with "wells or production facilities all around our home," and "we began to notice that lots of dust and noise had radically altered our home and our way of living." They describe physical ailments such as more frequent headaches, rashes, and trouble breathing, as well as "more anxiety and depression than we had experienced before." Mrs. Cerny states that she was no longer able to hang the family laundry outside to dry because it would be covered in dust. Mr. Cerny states that he attempted to open a BBQ business in a shack on their property, but had to close after only one month because too much dust was getting in the food. Both state that big trucks and constant traffic "were always moving along FM 99 directly in front of our house," which created loud noise and was upsetting. Neither affidavit identifies the oilfield company to which the trucks belonged or which caused constant traffic, nor identifies a particular company as having caused the dust and noise.

With respect to noxious smells, Mr. and Mrs. Cerny state that in 2012 they began to smell foul odors, "sometimes like rotten eggs, other times like pest spray, and other times in ways we could not describe," which became "constant" even inside the house because it does not have air conditioning. Both state that they have had to leave their home a few times "because the odors were so intense that we couldn't stand it anymore." They state that they feel much better after a day away, but "[w]hen we return, those smells assault our senses and our symptoms return." In his affidavit, Cameron Cerny, the Cerny s' minor son, states that "[t]he area around our home used to be very quiet and peaceful, with very little traffic," but "[t]hat all changed when the oilfield companies moved into the area." He explains that the family started smelling bad odors, even in the house because they have to leave the windows and doors open to stay cool. He states that

"[t]he smells were bad, and I started having trouble breathing after a while" and received an inhaler from the doctor. He also started getting nose bleeds. Cameron states that if he leaves the area, he does not have the nose bleeds and he breathes easier. Finally, he states that the situation has created "a lot of stress and frustration." Cameron does not identify any oil company by name in his affidavit.

Mr. and Mrs. Cerny's affidavits state that when the wind blows from the south, they smell a "strong smell that either caused or worsened many of our symptoms." They drove south one day and saw Plains' Kotara Ridley/Love Crews Drip Station "almost directly to the south of our property." Both state, "The place smelled terrible. From that day forward, we named it 'Stinkyville,' and we regularly smell its odors during southerly winds." As to Marathon, Mr. and Mrs. Cerny both state that in 2013, Marathon tested the air on their property and found "the presence of oilfield gases and chemicals on our property," but stated the amounts were "lower than the standards set out for an 8 hour workday." Mr. and Mrs. Cerny point out in their affidavits that they live there "24 hours a day, 7 days a week," as opposed to working for 8 hours and leaving. A letter dated May 3, 2012 from Marathon was included in the Cernys' summary judgment evidence. It states that Marathon conducted air monitoring at the Cernys' property regarding "reported odors," measuring for sulfur dioxide and hydrogen sulfide, along with Volatile Organic Compounds (VOC), which includes a group of chemicals found in oil and gas operations, and Lower Explosive Limit (LEL), which measures concentrations of potentially flammable chemicals. The test results pertaining to sulfur dioxide and hydrogen sulfide were then compared to TCEQ and OSHA exposure limits; the letter notes that TCEQ and OSHA have not established exposure limits for VOC or LEL. The letter explains that "[t]hese comparisons are important because TCEQ exposure limits are established based upon scientific evidence to protect people from short-term and long-term levels of exposure that can cause illness." The permissible

exposure limits (PEL) set by OSHA are "to protect industry workers against the health effects of exposure to hazardous substances," and are set "based on a typical worker's exposure over a normal work day (8-hr time-weighted average)." The letter further explains that most people are capable of detecting the odors of sulfur dioxide and hydrogen sulfide "far below the environmental and occupational health guideline levels," and that the "odor thresholds" for detecting sulfur dioxide and hydrogen sulfide are 0.020 ppm and 0.008 ppm, respectively. The letter concludes that the test results for sulfur dioxide and hydrogen sulfide at the Cernys' property were below the OSHA exposure guidelines. The result for sulfur dioxide was also below the TCEQ exposure limit of 0.4 ppm. The instrument used could only measure hydrogen sulfide in increments of 1.0 ppm and the test showed less than 1.0 ppm was present; the TCEQ exposure limit for hydrogen sulfide is 0.08 ppm. The letter and attached test results do not indicate the source of the gaseous chemicals tested.

Finally, Sharon Wilson's affidavit states that in March 2013 she recorded a FLIR[6] video at Plains' Kotara/Ridley Love Crews Drip Station showing a "huge release blowing across the road." Wilson states, "[t]here was an overpowering smell of hydrogen sulfide (rotten eggs)" and an air sample collected from the plume showed "several hazardous substances, including benzene at a rate 20 times above the . . . (TCEQ) Long Term Health Effects Screenings Limit." She further states that everyone in the group, except one person who was wearing a respirator, experienced "health effects including headache, nausea, sore throat and burning eyes and nasal passages." Wilson further states that, "[i]n order to see if any of these hazardous substances were migrating onto the Cerny property," she placed a 12-hour air sample canister outside the Cernys' house. She

---

[6] Wilson explained that FLIR Optical Gas Imaging is one of the methods used to see gases and other substances that are not visible to the naked human eye.

states that, "[t]he canister results at the Cerny property showed that 6 of the hazardous substances found at the [Plains] drip station were also found on the Cerny property including the benzene."

Viewing the lay witness affidavits and Marathon letter in the light most favorable to the Cernys, it does not amount to more than a scintilla of probative evidence that Marathon and Plains were the proximate cause of the dust, noise, traffic, and foul odors experienced by the Cernys. There is no evidence identifying Marathon or Plains as the proximate cause of the excessive dust and noise arising from the increased traffic on the road in front of the Cernys' home. As to the foul odors, the affidavits by Mr. and Mrs. Cerny and Sharon Wilson are merely speculative and conclusory as to the source of the odors experienced by the Cernys on their property. As to Plains, the Cernys assume a causal connection because the odors they smell when a southerly wind blows are the same as the odors they smelled the one time they drove by the Plains' drip station located south of their property. Wilson's affidavit shows only that six of the same "hazardous substances, including benzene," were present at the Cernys' property and at the Plains' drip station. As to Marathon, the Cernys' affidavits and the Marathon letter show only that Marathon's testing found the Cernys' property had sulfur dioxide, hydrogen sulfide, and other "oilfield gases and chemicals" in quantities lower than TCEQ and OSHA exposure standards for health and safety. Marathon's letter does not concede that its operations were a source of the gases and chemicals found on the Cernys' property. To the extent that the lay affidavits attempt to establish a causal link to Plains and Marathon, we conclude that the evidence is too conclusory and speculative, and therefore constitutes no legal evidence of a causal connection between the Cernys' alleged loss-of-use damages and these particular defendants. *See Natural Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 156 (Tex. 2011) (noting that opinion evidence offered by a lay witness must not be based on guesswork or conjecture, *i.e.*, be speculative, and must not simply state a conclusion without explanation, *i.e.*, be conclusory).

## CONCLUSION

Based on the foregoing reasons, we hold the trial court did not err in granting a no-evidence summary judgment in favor of Marathon and Plains on all the Cernys' claims and we affirm the trial court's judgment.

Rebeca C. Martinez, Justice